PETITION OF THE DEPARTMENT OF PUBLIC WELFARE
TO DISPENSE WITH CONSENT TO ADOPTION.

Suffolk.    October 7, 1976. — December 31, 1976.

Present: HENNESSEY, C.J., REARDON, BRAUCHER, KAPLAN, &
WILKINS, JJ.

*Adoption*, Dispensing with parent's consent.

Evidence in a proceeding under G. L. c. 210, § 3, supported a finding
that it was in the best interests of a child to be allowed to remain
with his foster parents as prospective adoptive parents and that his
natural mother was not capable or fit to care for him. [656-658]

PETITIONS filed in the Probate Court for the county of
Suffolk on February 28, 1969, November 8, 1972, and De-
cember 8, 1972.

The cases were heard by *Fitzpatrick, J.*

After review was sought in the Appeals Court, the Su-
preme Judicial Court, on its own initiative, ordered direct
appellate review.

The case was submitted on briefs.

*Kevin M. Keating & Charlotte Anne Perretta* for the
appellant.

*Brian T. Monahan* for the Department of Public Wel-
fare.

KAPLAN, J.    The mother (appellant here) was fourteen
years of age and unmarried when a boy was born to her on
July 16, 1968. The Department of Public Welfare (appel-
lee here) accepted the child from the mother for purposes
of foster care (see G. L. c. 119, § 23, cl. A[1]) and promptly

---

[1] Clause A, as appearing in St. 1954, c. 646, § 1, stated in part: "Upon
the application of a parent or guardian or any person acting in behalf
of the child, or of the child himself, the department may accept for
foster care any child under twenty-one years who in its judgment is in
need of foster care...." (The age is set at eighteen years by a 1973
amendment, St. 1973, c. 925, § 40.)

652                                          371 Mass. 651

Petition of Dept. of Pub. Welfare to Dispense with Consent to Adoption.

placed the child with foster parents who have raised him ever since in their home. In 1969 the department, as petitioner, commenced a proceeding in the Probate Court, naming the mother as respondent, to dispense with her consent to future adoption of the child. See G. L. c. 210, § 3A, as amended by St. 1964, c. 425, repealed by St. 1972, c. 800, § 3. On February 10, 1970, after hearing, a judge of that court entered a decree as prayed.[2] The mother took an appeal, but this was later dismissed, and the decree that had been appealed from was vacated by agreement on October 27, 1972.[3] Thus the proceeding was reinstated, now under G. L. c. 210, § 3 (as appearing in St. 1972, c. 800, § 2), a successor to and restatement of § 3A, "to dispense with the need for consent of . . . [a parent] to the adoption of a child in the care or custody of said department" on a finding that the "best interests of the child," as defined, would be served thereby. (Section 3 is set out more fully in the margin.[4]) The mother applied in the proceeding for

---

[2] In his report of material facts, the probate judge noted that the mother had been "uncontrollable" at the hearing and had attacked her mother physically and abused her mother and the social worker.

[3] This was to accommodate to the mother's claim of changed circumstances.

[4] Section 3 reads (with omissions) as follows: "(a) Whenever a petition for adoption is filed by a person having the care or custody of a child, the consent of the . . . [parents] shall not be required if: — . . . (ii) the court hearing the petition finds that the allowance of the petition is in the best interests of the child, as defined in paragraph (c). (b) The department of public welfare or any licensed child care agency may commence a proceeding, independent of a petition for adoption, in the probate court . . . to dispense with the need for consent of . . . [a parent] to the adoption of a child in the care or custody of said department or agency. . . . The court shall issue a decree dispensing with the need for said consent . . . for adoption of such child subsequently sponsored by said department or agency if it finds that the best interests of the child as defined in paragraph (c) will be served by said decree. . . . (c) In determining whether the best interests of the child will be served by granting a petition for adoption without requiring certain consent as permitted under paragraph (a), the court shall consider the ability, capacity, fitness and readiness of the child's parents . . . to assume parental responsibility and shall also consider the ability, capacity, fitness and readiness of the petitioners under paragraph (a) to assume such responsibilities. In determining whether the best interests of the child will be served by issuing a decree dispensing with the

371 Mass. 651                                               653

Petition of Dept. of Pub. Welfare to Dispense with Consent to Adoption.

the production and return of the child, and the department responded with a petition for custody (see G. L. c. 119, § 23, cl. C;[5] cf. *Boyns* v. *Department of Pub. Welfare*, 360 Mass. 600 [1971]). The three matters — dispensing with consent, production, and custody — were tried together at some length in January, 1973, and the trial was continued to June, 1973, at which time the report of a "guardian ad litem and investigator" was received and considered. Finally, on May 1, 1974, a probate judge (not the judge who had acted in 1970) entered decrees in favor of the department: the mother's consent to adoption was ordered dispensed with (the department having sponsored a plan for adoption of the child by the foster parents), and correspondingly production was denied and custody continued in the department. The mother took her appeals from these decrees to the Appeals Court and we transferred the appeals here on our own motion.

A report of material facts by the probate judge provides an accurate summary of the evidence as recorded in the transcripts which are available to us. We recount only the substance. The mother is white, the father black. The mother was attending school in the ninth grade when she became pregnant. As a practical matter the child could not be left with her, since the child's father was evidently unconcerned and the mother's family could not help (the

---

need of consent as permitted under paragraph (*b*), the court shall consider the ability, capacity, fitness and readiness of the child's parents ... to assume parental responsibility, and shall also consider the plan proposed by the department or other agency initiating the petition. If said child has been in the care of the department or a licensed child care agency for more than one year, in each case irrespective of incidental communications or visits from his parents ... there shall be a presumption that the best interests of the child will be served by granting a petition for adoption as permitted under paragraph (*a*) or by issuing a decree dispensing with the need for consent as permitted under paragraph (*b*)."

[5] Clause C, as appearing in St. 1960, c. 325, states in part: "The department may seek and may accept on order of a probate court the custody of any child under twenty-one years who is without proper guardianship due to the death, unavailability or incapacity of the parent or guardian, or on the consent of the parent or parents. ..."

family was broken by divorce, the mother's father resided outside the State, and her mother was working as a waitress). The child's mother abandoned school after the tenth grade. She never achieved any training for a craft of any sort, and seems seldom to have held any job: at the time of trial in January, 1973, she said she had last worked in 1971. She lived with her mother until about February, 1970, and then commenced to live apart. She had had no stable relationship with a man. After leaving her mother she appears to have had "major relationships," successively, with three men in the course of a year; none had any solidity. In July, 1972, she married the father of her child but that connection did not last for more than a few months. At the time of trial, she could not give a clear account of her means or prospects of support (the probate judge said she "has no identifiable source of income"): she was not working, was looking to her husband, living his own life, to pay her rent and perhaps something more, and expecting or hoping that her mother or father or friends might contribute.

The mother showed interest in the child by urging the social workers to arrange visits and by attending those that were arranged. It is a poignant fact that the mother underwent a hysterectomy in 1969 and could not bear another child. But it must be noted, as the probate judge found, that the mother "never formulated any realistic plan for taking care of [the child]" if he should be returned to her. She spoke of getting a job and having someone take care of the child while she was at work, but, as indicated, there was no reasonable assurance from her conduct that she was serious about finding work. The father continued indifferent or worse, and had in fact signed a "surrender" before the date of trial, i.e., formally consented to adoption of the child. When he was talked to about appearing at the trial, he told the mother he was agreeable if she was prepared to pay him for doing so.

Testimony of a psychologist brought out that the child, four and one-half years of age when the case was tried, is a boy of bright and perhaps superior intelligence according

371 Mass. 651                                   655

Petition of Dept. of Pub. Welfare to Dispense with Consent to Adoption.

to standard tests. He appeared emotionally stable. The only negatives suggested by the psychologist — quite mild ones — were an indication of some insecurity conceivably traceable to the child's knowledge that he had "two mothers," and a question whether he was achieving to the full measure of his apparent capacity. To separate him from the foster parents whom he knew almost since birth would be a traumatic or wrenching experience, the degree of hurt being dependent on the care with which the separation was carried out and the quality of the environment into which he would be introduced.

The probate judge reported that the child had "developed very well under the loving care and concern" of the foster parents who had indicated a desire to adopt the child as early as 1970 when they learned the department might sponsor such a plan. The couple is biracial; the husband is black and the wife is of Hawaiian extraction. They are an "unusual" pair. They had a fourteen room house in good condition in which they lived with one adopted child and two foster children in addition to the child here in question. Six men (the number at the time of trial) released from mental hospitals also boarded there (the wife being a "family care mother" for the Department of Mental Health). Counsel for the child's mother expressed doubt about the crosscurrents that might be set up by the presence of these men in the home, and the psychologist pointed out that they might generate a form of "competition" with the child for the affection of the couple. The subject is treated in the rather elaborate report of the guardian ad litem and investigator who came away with a high opinion of both the wife and husband (he considered the husband a strong male figure) and with approval of the whole atmosphere at the home. The probate judge did not consider the home situation a factor disqualifying the couple; on the contrary, she reported that the wife was "a warm, understanding person and an excellent homemaker and organizer," and a "good manager" able to care for all those in the home. The couple had a "stable marriage" and maintained a "suitable home environment."

656                                    371 Mass. 651

Petition of Dept. of Pub. Welfare to Dispense with Consent to Adoption.

The probate judge found, in conformity with the terms of § 3, as amended, that "it is in the best interest of [the child] to be allowed to remain with the [foster parents] as prospective adoptive parents," and that the mother of the child "is not capable or fit to care for [him]." Accordingly, the stage was set for adoption proceedings as planned by the department.[6]

Counsel for the mother attacks the findings as unsupported, but on a reading of the entire record in relation to the findings, the latter seem to us not only not "clearly erroneous" (see Mass. R. Dom. Rel. P. 52 [a]) but amply justified by the totality of the evidence.

The present case bears comparison with *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631 (1975), in which a majority of the court, upon detailed consideration, affirmed a decree of a probate judge dispensing with maternal consent to adoption. There, as here, the mother had a feeling and desire for the child in foster care, but she appeared to be incapable of facing up in any practical way to the day-to-day problems of raising the child if it should be given over to her, and damage to the child could be foreseen if that were done. The proposed adoptive parents were suitable. *Little Wanderers* is authority for affirmance here.

What made *Little Wanderers* a difficult case, engendering a dissent by one of the Justices, was that the period of foster care had been relatively short — ten months. On the one hand, this raised a question whether the mother's intentions and reliability had been given a fair chance to display themselves, and, on the other hand, it raised a legal question whether the department after such an interval should be held to have had "care or custody" within the

---

[6] Although the department's plan for adoption is considered as a part of the proceeding to dispense with consent (see note 4 *supra*), the actual adoption proceeding is separate and must be independently conducted and proved. See *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 635 n.3 (1975).

371 Mass. 651                                                   657

Petition of Dept. of Pub. Welfare to Dispense with Consent to Adoption.

meaning of § 3, a predicate for the application of the "best interests" test stated in the same section. A majority of the court thought the facts were sufficiently established, and that care or custody was present; also that "best interests" was made out and, indeed, that in the circumstances of the case there was not much room for difference between the "fitness" element of that test and the "fitness" criterion the dissenting Justice said he would apply where the child had not been remitted to the department's "care or custody" over a substantial period of time.

In the present case the dubieties of *Little Wanderers* do not exist, or at least appear in much less troublesome form. Here foster care under the supervision of the department had been going on for four and one-half years at the time of trial in January, 1973, and the whole situation of mother and child was then reviewed comprehensively, with later supplemental analysis by the guardian. There is no basis for reproach that the probate judge's decision was taken on grounds insufficiently matured. The lapse of time had a further importance here because the plan was for the child to be adopted by the foster parents: the ties that bound the child to that couple had become stronger, and separation of the child from the couple more hazardous, with the passing years. (In *Little Wanderers* a new couple, not the foster parents, were to adopt the child.) Nor can it be fairly suggested here that the department deliberately played a waiting game in order to weaken the mother's claim.[7] Lastly, we may note that the probate judge expressly found unfitness of the mother which we take in context to mean not moral degeneracy but rather, in the words of the dissenting Justice in *Little Wanderers*, "egregious faults in parental character ... [rising] to the level of unfitness." (*Id.* at 648.)

A contention that the "best interests" test is constitutionally invalid as applied to the facts of the present case

---

[7] Any delays seem not attributable to the department and there is evidence that as late as mid-1972 the social worker was still open to a plan to return the child to the mother if one could be shown to be plausible.

658                                            371 Mass. 651

Petition of Dept. of Pub. Welfare to Dispense with Consent to Adoption.

has less merit than a like contention made in *Little Wanderers,* which the court rejected. There is also a contention that, as the proceeding to dispense with consent was initiated under G. L. c. 210, § 3A, it must continue on that basis despite the repeal of § 3A and the substitution of § 3, as amended, before the trial in January, 1973. The probate judge ruled correctly at the outset of that trial that the applicable statute was now § 3, and we need not pursue the mother's flimsy argument of "retroactivity" further than to say that, so far as relevant, § 3 is not materially different from § 3A.[8]

With a formal change in one of the decrees appealed from,[9] the decrees are affirmed.

*So ordered.*

---

[8] See *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption, supra* at 645. Section 3, as amended, added a reference to "readiness of the child's parents ... to assume parental responsibility," which would, we think, be implied in "ability" or "capacity." Section 3, as amended, also established a presumption that the best interests of the child would be served by dispensing with consent when the child has been in the department's custody for more than a year, but this was not relied on in the present case or in *Little Wanderers.*

[9] By evident inadvertence the decree dispensing with consent refers in the recital to the repealed § 3A; it should refer to the current § 3, as amended.