The father appeals from a decree issued by a Juvenile Court judge terminating his parental rights to his daughter, placing the child into the care of the Department of Children and Families (DCF), and approving a plan for adoption of the child.[3] The father argues that the judge erred in finding clear and convincing evidence of parental unfitness because (1) the evidence was stale; (2) certain of the judge's findings were erroneous; and (3) the judge erred in finding reasonable efforts on the part of DCF to reunify the father and the child. We affirm.
1. Standard of review. "To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests." Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). "Parental unfitness must be determined by taking into consideration a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age." Adoption of Mary, 414 Mass. 705, 711 (1993).
On review of a decision to terminate parental rights, we give substantial deference to the judge and "reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. 53, 59 (2011). "A finding is clearly erroneous when there is no evidence to support it, or when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " Custody of Eleanor, 414 Mass. 795, 799 (1993), quoting from Building Inspector of Lancaster v. Sanderson, 372 Mass. 157, 160 (1977). An abuse of discretion exists where the reviewing court concludes that "the judge made 'a clear error of judgment' ... such that the decision falls outside the range of reasonable alternatives." L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014), quoting from Picciotto v. Continental Cas. Co., 512 F.3d 9, 15 (1st Cir. 2008).
2. Termination decision. a. Stale evidence. Although the judge considered evidence admitted at a temporary custody hearing two years prior to trial, an abundance of relevant evidence, past and present, warranted the conclusion that the father was unfit to parent the child and would likely remain unfit in the future. The evidence showed that the father had failed to visit or even contact the child since August of 2015-more than eight months prior to the trial. He failed to complete his mandatory DCF service plans and ultimately ceased all contact with DCF. The father did not meaningfully participate in the termination proceedings-nor even attend the trial.
This evidence was not stale; rather, the father's "current absence from the child's life, lack of communication with DCF, and failure to attend the proceedings generally were relevant factors in determining whether to terminate [his] parental rights." Adoption of Talik, 92 Mass. App. Ct. 367, 373 (2017). Accord Adoption of Astrid, 45 Mass. App. Ct. 538, 544 (1998) ; Adoption of Fran, 54 Mass. App. Ct. 455, 462-463 (2002). The father's failure to appear at trial after notice, without explanation, was also relevant to his unfitness. Talik, supra at 371-372 ("Where a parent has notice of a proceeding to determine his parental rights and the parent does not attend or provide an explanation for not attending, the absence may suggest that the parent has abandoned his rights in the child or cannot meet the child's best interests").
Furthermore, because "a judge may rely upon a parent's prior pattern of behavior in determining parental unfitness," Adoption of Ramona, 61 Mass. App. Ct. 260, 264 (2004), evidence of the father's past conduct was properly considered because of its ongoing nature. See Adoption of Larry, 434 Mass. 456, 469 (2001) ("[P]ast parental conduct [is] relevant ... where the evidence support[s] the continuing vitality of such conduct"). His history of problems with alcohol use (including coming to visits with an odor of alcohol), domestic violence, and criminal conduct was particularly relevant in assessing his current unfitness. See Care & Protection of Frank, 409 Mass. 492, 494 (1991) ("Evidence of alcohol or drug abuse clearly is relevant to a parent's willingness, competence, and availability to provide care"); Care & Protection of Thomasina, 75 Mass. App. Ct. 563, 576 (2009), quoting from Frank, supra at 495 ("[T]o the extent it bears on fitness, ... evidence of prior convictions may properly be weighed in the balance"); Talik, 92 Mass. App. Ct. at 374, quoting from Custody of Vaughn, 422 Mass. 590, 595 (1996) ( "It is well established that exposure to domestic violence works a 'distinctly grievous kind of harm' on children ... and instances of such familial violence are compelling evidence for a finding of parental unfitness"). Because of this history, the father's continued sobriety, treatment, and counselling were essential elements of his service plans. Accordingly, the judge properly considered evidence of the father's prior behavior in connection with the father's failure to maintain service plans or obtain counselling. Talik, supra.
b. Erroneous findings. The judge made over 150 detailed factual findings, based closely on the evidence, warranting the conclusion that the father was unfit to parent the child and likely would remain unfit in the future. The judge's findings were supported by the testimony of two closely-involved DCF social workers and thirty-two documentary exhibits. See Eleanor, 414 Mass. at 799 (findings "must be specific and detailed so as to demonstrate that close attention has been given the evidence"); Adoption of Anton, 72 Mass. App. Ct. 667, 673 (2008).
In this light, the father's criticisms of the judge's findings after the temporary custody hearing are misplaced. Contrary to the father's argument, the judge did not base that decision solely on the father's lying to DCF and the mother's hospitalization. Rather, the judge based that decision on fourteen separate reasons, including the father's continued use of alcohol while caring for the child, leaving the child alone with the mentally ill mother despite promising not to do so, and his continued failure to maintain a safe living environment for the child. The judge's finding that "[a] clearly dirty and malfunctioning kerosene furnace in a small, enclosed place, with no carbon monoxide detector presents a danger" was well grounded in common sense, and the judge was not required to credit the testimony of the oil company representative who admitted that he was "not an expert in flammables or combustibles" and had no working sense of smell. The judge properly exercised "her discretion to evaluate a witness's credibility and to weigh the evidence" in making her factual findings. Adoption of Gillian, 63 Mass. App. Ct. 398, 403 (2005), quoting from Adoption of Nancy, 443 Mass. 512, 515 (2005).
c. Reasonable efforts. DCF "must make 'reasonable efforts' aimed at restoring the child to the care of the natural parents" before seeking to terminate parental rights. Adoption of Uday, 91 Mass. App. Ct. 51, 53 (2017), quoting from Ilona, 459 Mass. at 60. Such reasonable efforts mean DCF must accommodate the limitations or special needs of parents "that affect the receipt of [DCF] services."[4] Ilona, supra at 61. This duty, however, is contingent on the parents' fulfillment of their own responsibilities, Adoption of Mario, 43 Mass. App. Ct. 767, 774 (1997), including service plan compliance and maintaining meaningful contact with DCF. See Adoption of Eduardo, 57 Mass. App. Ct. 278, 282 (2003). Moreover, "even where the department has failed to meet this obligation, a trial judge must still rule in the child's best interest." Ilona, supra, citing G. L. c. 119, § 29C.
Here, DCF's lamentable failure to arrange the child's visitation while the father was incarcerated or to provide requested paperwork regarding particular services does not preclude the judge's finding of reasonable efforts.[5] First, the record is replete with consistent evidence of DCF's assistance and services to the father, including access to substance use treatment, counselling and therapy, parental skills training, housing and budgeting assistance, and even the partial payment of fuel and electric bills. DCF directed these services towards permanent reunification until the father's issues with alcohol consumption, service plan noncompliance, and failure to maintain a safe home environment led DCF to seek to terminate the parents' rights.
Although the father was not provided with visitation during his incarceration, he was incarcerated only for three weeks in April, 2015, and some weeks between late June and early July, 2015. The father was not denied child visitation or DCF services after his release but rather chose to cease cooperation.
DCF ceased its permanent reunification efforts only after the father again failed to engage and comply with his service plans-including being evicted from housing for being highly intoxicated. He remains in complete noncompliance with his latest plan, and has had no contact with DCF or the child since August, 2015. The father's complaints about DCF's efforts ring hollow in light of his persistent failure to take advantage of those efforts. See Mario, 43 Mass. App. Ct. at 774 ; Eduardo, 57 Mass. App. Ct. at 282. We discern no error in judge's finding of reasonable (though certainly far from perfect) efforts by DCF.
Decree affirmed.

The judge also terminated the mother's parental rights, but she withdrew her appeal of the decree prior to briefing.

For incarcerated parents, this includes reasonable efforts to enable the child's "regular visitation" and holding "case conferences and other consultations at the correctional facility." 110 Mass. Code Regs. § 1.10 (2008).

The father's claim that DCF's communications with a housing authority resulted in his inability to obtain housing required by his service plan is also without merit. DCF could respond with accurate information to the housing authority's request for the child's custody status, and the social worker had no knowledge or intent that such communications would have an adverse impact on the father's ability to obtain housing.